**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| MARQUEZ COLEMAN, | : | Case No. 1:17-cv-599 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| JONAS ONINKU, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT (Doc. 21)**

This civil case is before the Court on Defendants Jonas Oninku, Edwin Bailey,

Brendan Kelly, Dustin Bennett, and Scott Drake's motion for summary judgment (Doc.

21) and the parties' responsive memoranda (Docs. 34, 35).

**I. BACKGROUND[1]**

On June 10, 2016, Plaintiff Marquez Coleman was an inmate at Lebanon

Correctional Institution when he was involved in a use of force event with Defendants

Oninku, Bailey, Kelly, Bennett, and Drake. (Doc. 21-10 at ¶¶ 1–2).

**A. Use of Force Incident**

At the time of the event, Bailey asked Coleman to step out of an inmate line for a

dress-code violation. (*Id*. at ¶ 3). Coleman stepped out of line and Bailey began a pat-

down search. (*Id*. at ¶ 4). During the search, Oninku approached Bailey and Coleman,

---

[1] Pursuant to the Court's Standing Order, Defendants filed a Statement of Proposed Undisputed Facts, and Coleman filed a Response to Proposed Statement of Undisputed Facts and a Statement of Disputed Issues of Material Fact. (Docs. 21-10, 34-1). The Court's statement of facts set forth in this Order is based on those filings.

and Oninku began talking to Coleman. (*Id*. at ¶ 5). After a few to thirteen seconds of Coleman and Oninku speaking, Coleman attempted to return to the inmate line. (*Id*. at ¶ 6). Oninku, however, redirected Coleman to the wall where his first pat-down occurred. (*Id*.) Oninku then began another pat-down search with Coleman's hands placed on the wall. (*Id*. at ¶ 8).

The use of force event then began – the nature of which, the parties dispute. (*See* Video of Incident, Doc. 2).

**Moving-Defendants' Perspective**. As Oninku was conducting a pat-down search of Coleman, Coleman removed his left hand from the wall and his elbow backwards and towards Oninku and Bailey. (Doc. 21-10 at ¶ 9). Oninku used a "balance displacement technique," and Coleman was moved to the ground. (*Id*. at ¶ 10). Bailey attempted to handcuff Coleman; however, Coleman's left arm was placed under his body. (*Id*. at ¶ 11). Bailey used nine short-rapid shoulder strikes to cause Coleman to release his arm to be cuffed. (*Id*.) Plaintiff tried to push himself off the ground. (*Id*. at ¶ 12). Oninku held Coleman's head in place to prevent him from spitting on any officers. (*Id*).

Meanwhile, as Coleman was displaced to the ground, Kelly responded via radio call signal. (*Id*. at ¶ 13). Kelly then assisted with restraining Coleman, using his left knee to secure Coleman's right leg to prevent him from kicking. (*Id*.) Drake arrived, removing his PR-24 (baton) from its holster to prevent it from being displaced. (*Id*. at ¶ 14). Drake dropped to his knees and tried to re-secure his PR-24 to its holster; however, he was unsuccessful and placed the PR-24 in his lap while he assisted with handcuffing Coleman. (*Id*. at ¶ 15).

Other officers responded, including Bennett. (*Id*. at ¶ 16–18). Coleman was still physically resisting restraint and disregarding officer directives. (*Id*. at ¶ 19). Bennett then deployed a short burst of OC spray to Coleman's face to gain compliance. (*Id*.) Coleman was then secured in handcuffs. (*Id*.)

**Non-Moving Plaintiff's Perspective.** After Oninku finished his pat-down search of Coleman, Oninku pulled back on Coleman, causing his left hand to leave the wall. (Doc. 34-1 at ¶ 9). Coleman and Oninku spoke, and Coleman returned his hand to the wall. (*Id*.) Oninku then reached down, grabbed, and pulled backward Coleman's left leg, and kicked Coleman's right leg from under him. (*Id*. at ¶ 10). Coleman fell to the ground, landing on his stomach. (*Id*.)

Bailey then punched Coleman in his head, neck, and shoulders approximately 20 times. (*Id*. at ¶ 11). Coleman's hands were in plain view and Bailey could access them. (*Id*.) At this time, Oninku grabbed Coleman's head and slammed his head into the ground two times. (*Id*. at ¶ 12). Coleman did not try to push himself off the ground and his hands were still visible at his sides. (*Id*.) Coleman did not try to spit on anyone. (*Id*.)

Kelly witnessed the entire altercation between Bailey, Oninku, and Coleman. (*Id*. at ¶ 13). Kelly quickly approached after Coleman was taken to the ground, knelt on Coleman's right leg, and then called for assistance over the radio. (*Id*.) Coleman did not try to kick anyone. (*Id*.) Drake then approached, removed his PR-24 from his belt, knelt down next to Coleman, and jabbed Coleman in his left side two times. (*Id*. at ¶¶ 14–15).

3

Coleman was handcuffed. (*Id*. at ¶ 19). He was not resisting, his hands were in full sight, and he was complying with officer directives. (*Id*.) Bennett then arrived at the scene and sprayed Coleman's face with OC spray. (*Id*.)

## B. Administrative Remedies

The Court has previously discussed the facts related to Coleman's use of administrative remedies. (Doc. 19 at 1–3). Defendants move for summary judgment again, in part, for Coleman's failure to exhaust administrative remedies; thus, the Court details those facts again here.

The parties agree that the Ohio Administrative Code sets out a three-step process to exhaust administrative remedies when an inmate seeks relief from any aspect of institutional life that directly and personally affects the grievant. (Doc. 21-10 at ¶¶ 20-10). First, the grievant must file an informal complaint with the appropriate supervisor within 14 days of the events giving rise to the informal complaint. (*Id*.) If the grievant is not satisfied with the response, the grievant then must file an appeal of the informal complaint decision with the institutional inspector. (*Id*. at ¶ 28). If the grievant is still unsatisfied, the grievant then must file an appeal to the Chief Inspector's Office. (*Id*. at ¶ 31). After the appeal to the Chief Inspector's Office is complete, administrative remedies are exhausted and the grievant may file suit.

The parties agree that Coleman needed to file an informal complaint arising out of the use of force event by June 24, 2016. (*Id*. at ¶ 25). Coleman filed his informal complaint in May 2017. (*Id*. at ¶ 26). Coleman, however, states that he was unable to

timely submit an informal complaint form because he was not provided with such forms, even after request. (Doc. 13-1).

The response to the informal complaint notes that Coleman "only had 14 days to submit" his informal complaint after the event. (Doc. 21-2, Ex. B-2). Coleman appealed this response to the institutional inspector. (Doc. 21-10 at ¶ 28). Coleman's grievance was denied. (Doc. 21-2, Ex. B-4). Coleman then filed an appeal with the Office of the Chief Inspector. (Doc. 21-10 at ¶ 30). The decision of the institutional inspector was affirmed. (Doc. 21-2, Ex. B-6).

## II. STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

### III. ANALYSIS

Coleman brings two claims in this lawsuit: (1) excessive force against all Defendants (Doc. 1 at ¶ 44); and (2) failure to prevent the use of excessive force against Defendants Kelly, Bailey, Drake, and Bennett (*id*. at ¶¶ 46–47). Defendants move for summary judgment, requesting dismissal of Coleman's entire complaint for three reasons: (1) Coleman's failure to exhaust administrative remedies; (2) judgement as a matter of law based on the undisputed, material facts; and (3) qualified immunity.

### A.    Exhausting Administrative Remedies

Defendants first argue that Coleman cannot succeed on his claims because he failed to exhaust administrative remedies. (Doc. 21 at 8–16). The Court has already considered – and rejected – this argument when deciding Defendants' first motion for summary judgment. (Doc. 19). For the same reasons discussed in that Order, the Court again denies Defendants' request for summary judgment based on failure to exhaust administrative remedies.

The Court recognizes that Defendants present two new arguments in their motion related to exhausting administrative remedies, and the Court will address each in turn.

First, Defendants request that this Court use a burden-shifting analysis other circuits have used when considering whether a plaintiff has exhausted administrative remedies. (Doc. 21 at 10–11 (citing cases from the Second, Seventh, Ninth, Tenth, and Eleventh Circuits)). According to Defendants, such a test would require the defendant to raise exhaustion, then the burden shifts to the plaintiff to establish that administrative remedies were unavailable. (*Id*. at 11).

6

However, as Defendants acknowledge, the Sixth Circuit does not apply a burden-shifting framework to exhausting administrative remedies. The Sixth Circuit has held, and continues to hold, that failure to exhaust administrative remedies is an affirmative defense that the defendant bears the burden of establishing. *Napier v. Laurel County*, 636 F.3d 218, 225 (6th Cir. 2011); *Dykes-Bey v. Finco*, No. 20-1624, 2021 WL 2767584 (6th Cir. Feb. 2, 2021). Moreover, summary judgment is appropriate for failing to exhaust administrative remedies only if the defendants "establish the absence of a 'genuine dispute as to any material fact' regarding non-exhaustion." *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). Defendants provide this Court with no persuasive reason to depart from precedent, and this Court declines to do so.

Moreover, as discussed in this Court's prior Order, there are material issues of fact concerning whether Coleman was able to timely exhaust remedies, given: (1) Coleman was placed in solitary confinement after the incident; and (2) the disputed facts concerning whether Coleman asked for an informal complaint form while in solitary and was not provided a form. (Doc. 19). And, as already discussed, Coleman "is <u>not required</u> to exhaust remedies that are not available to him." (*Id*. (citing *Hill v. Snyder*, 817 F.3d 1037, 1041 (7th Cir. 2016)) (emphasis in original)).

Second, Defendants present the affidavit Lora Austin, an employee at Lebanon Correctional Institution. (Doc. 21-1). The affidavit purports to show that Coleman had other avenues to timely pursue his administrative remedies while in solitary confinement; thus, Coleman failed to exhaust his administrative remedies. (*Id*. at ¶ 10).

Coleman first suggests that the Austin affidavit should be stricken because she was disclosed over seven months after the deadline for disclosure of lay witnesses, which deadline was March 16, 2018, and she was disclosed at 4:30 p.m. on the day discovery closed on October 30, 2018. (Doc. 34 at 20). Defendants suggest that Coleman did not object in October 2018 when Austin was disclosed, and the affidavit is appropriately presented to the Court. (Doc. 35 at 3).

Rule 26(a)(1)(A)(i) of the Federal Rules of Civil Procedure imposes a mandatory obligation on each party to initially disclose the identity of "each individual likely to have discoverable information…that the disclosing party may use to support its claims or defenses." Additionally, initial disclosures must be made at the beginning of litigation, "without awaiting a discovery request" from the opposing party and must occur within 14 days of the discovery planning conference that the parties must conduct under Rule 26(f). *See* Fed. R. Civ. P. 26(a)(1)(A) & (C).

Moreover, this Court's Cincinnati Civil Procedures Standing Order provides:

> All witnesses to be called during a party's case-in-chief must be disclosed within sufficient time to permit discovery. Unless otherwise ordered, plaintiff will disclose to defendant the names of all expert witnesses at least 60 days prior to the discovery deadline; defendant will disclose to plaintiff the names of all expert witnesses at least 45 days prior to the discovery deadline; and both parties will disclose the names of all other case-in-chief witnesses at least 30 days prior to the discovery deadline. No additional witnesses may be listed in the Final Pretrial Order except by permission of the Court. Witnesses whose testimony is limited to rebuttal of an opponent's case need not be listed.

"Federal Rule of Civil Procedure 37(c)(1) requires absolute compliance with Rule 26(a), that is, it 'mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified.'" *Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003) (quoting *Vance v. United States*, No. 98–5488, 1999 WL 455435, at *3 (6th Cir. June 25, 1999)). The Sixth Circuit has "put the burden on the potentially sanctioned party to prove harmlessness." *Id*. *See also* Fed. R. Civ. P. 37(c) advisory committee notes to 1993 amendment (Rule 37(c) "provides a self-executing sanction for failure to make a disclosure required by Rule 26(a), without need for a motion"). Moreover, Rule 37(b)(2) provides the Court with meaningful discretion to sanction a party when the party fails to obey a discovery order.

Defendants do not dispute that Austin was not timely disclosed in their initial disclosures, pursuant to the Calendar Order, or in accordance with this Court's Standing Orders. Given the self-executing nature of Rule 37 and Defendants' lack of argument demonstrating their failure to disclose was harmless, the Court **STRIKES** the Austin affidavit in support of Defendants' motion for summary judgment.[2] When reaching this conclusion, the Court reserves any judgment on whether it would be appropriate for Defendants to present Austin as a witness at trial.

Accordingly, for the reasons already stated by this Court in its Order denying Defendants' first motion for summary judgment, and as expanded upon here, Defendants'

---

[2] Even if it were proper to consider the contents of the Austin affidavit, there is still a genuine dispute of material fact concerning whether Coleman was able to exhaust his administrative remedies as discussed in this Court's prior Order. (Doc. 19).

second motion for summary judgment for failure to exhaust administrative remedies is **DENIED**.

### B.    Count I - Excessive Force

Defendants next discuss the merits of Coleman's Eighth Amendment excessive force claim.  The Eighth Amendment prohibits the government from imposing "cruel and unusual punishment" upon prisoners.  U.S. Const. amend. VIII.  But not every shove by a prison guard gives rise to a constitutional violation.  *See Hudson v. McMillian*, 503 U.S. 1, 9–10 (1992); *Cordell v. McKinney*, 759 F.3d 573, 580 (6th Cir. 2014).  Sometimes "[t]he maintenance of prison security and discipline may require that inmates be subjected to physical contact actionable as assault under common law."  *Combs v. Wilkinson*, 315 F.3d 548, 556 (6th Cir. 2002) (citation omitted).  Prison officials nonetheless violate the Eighth Amendment when their "'offending conduct reflects an unnecessary and wanton infliction of pain.'"  *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (quoting *Pelfrey v. Chambers*, 43 F.3d 1034, 1037 (6th Cir. 1995)).

There are two components to an Eighth Amendment claim: the objective and subjective components.  "First, the subjective component focuses on the state of mind of the prison officials."  *Cordell*, 759 F.3d at 580 (citing *Williams*, 631 F.3d at 383).  When answering the subjective component, we ask "whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson*, 503 U.S. at 7.  Second, "the objective component requires the pain inflicted to be sufficiently serious."  *Cordell*, 759 F.3d at 580 (citing *Williams*, 631 F.3d

10

at 383). "This component requires a 'contextual' investigation, one that is 'responsive to contemporary standards of decency.'" *Id.* (quoting *Hudson*, 503 U.S. at 8).

### 1.     Subjective Component

The subjective component considers the officials culpable state of mind and "[w]e ask 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Cordell*, 759 F.3d at 580 (quoting *Hudson*, 503 U.S. at 7).

> In determining whether a prison official had a culpable state of mind, we have found it helpful to consider "such factors as the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted," as well as "the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them, and any efforts made to temper the severity of a forceful response."

*Cordell*, 759 F.3d at 581 (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)) (alteration in original). Considering these factors and the record in Coleman's favor, a reasonable jury could find that Defendants acted with malicious and sadistic intent to cause harm.

In support of the subjective component, Defendants contend that "the video is dispositive in this instance." (Doc. 21 at 19). The Court disagrees. As detailed, *supra*, the parties contest the nature of the incident and whether the use of force was appropriate.

**Defendant Bailey**. The parties agree that the Bailey first pulled Coleman from the inmate line to address a dress-code violation. Once Coleman was taken to the ground, the parties agree that Bailey started hitting Coleman's left side. Citing the Investigation Summary Report Use of Force (the "Report") generated after the incident, Coleman

11

states that Bailey punched him approximately 20 times in his head, neck, and shoulder area. (Doc. 24-1 at PageID# 470). Coleman also claims that his hands were visible and able to be restrained. (Coleman Dep., Doc. 21-8 at PageID# 168, 105:16–106:15). Conversely, Bailey contends that he used a closed-fist, striking technique nine times, and that he used this maneuver to get Coleman's left arm from underneath his body and to restrain him. (Bailey Dep., Doc. 24 at PageID# 420, 101:4–25–102:25). The videotape of the encounter shows that Bailey used a punch and/or closed-fist strike on Coleman. (Doc. 2). It does not clearly show whether Coleman's left arm was below his body or visible. (*Id*.)

Considering the foregoing in light most favorable to Coleman, a reasonably jury could find that the need and amount of force used by Bailey – 20 punches to the shoulder, neck, and head area while Coleman was not aggressive and his hands were free to be cuffed – was not to maintain or restore discipline but used maliciously and sadistically to cause harm.

**Defendant Oninku.** The parties agree that Oninku approached after Bailey pulled Coleman out of line for wearing shorts instead of pants, and then Oninku conducted his own search. Oninku states that Coleman was making aggressive moves and turning around, prompting Oninku to use a "balance displacement maneuver" to guide Coleman to the ground. (Doc. 21-4; Oninku Dep., Doc. 23 at PageID# 240, 51:18-52:20). Coleman, however, testified that he was not acting aggressively and was physically compliant with the officer's orders. (Coleman Dep. Doc. 21-8 at PageID# 165–67, 96:9–104:19). Bailey also testified that Oninku placed Coleman on the ground to remove and

look at Coleman's shoe. (Bailey Dep., Doc. 24 at PageID# 377–79, 58:8–60:5). Then, according to Coleman, once he was on the ground, Oninku grabbed his head and slammed it into the ground two times. (Doc. 34 at 15 (citing Doc. 2; Doc. 24-1 at PageID# 469–70)). At this point, there were three officers on top of Coleman. (Doc. 2). Oninku states that he did not "slam" Coleman's head, he held down Coleman's head to prevent him from spitting on the officers. (Doc. 24-1).

The video shows that Oninku took Coleman to the ground. (Doc. 2). The video shows Coleman's head hit the ground on two occasions because of some level of force used by Oninku. (*Id.*) The Report also describes that "Oninku forcibly pushing [Coleman's] head down into the ground." (Doc. 24-1 at PageID# 469–70).

Considering the foregoing in light most favorable to Coleman, a reasonably jury could find that the need and amount of force used by Oninku – taking Coleman's body to the ground and slamming his head into the ground two times – was not to maintain or restore discipline but used maliciously and sadistically to cause harm.

**Defendant Kelly.** The parties agree that Kelly was the third officer to respond, after Oninku and Bailey. The parties agree that Kelly witnessed the entire event while knelling on Coleman's right leg and that Kelly sent a call over the radio for assistance. Kelly declares that he knelt on Coleman's leg to prevent Coleman from kicking anyone. (Doc. 21-5). Coleman states there is no evidence that he tried to kick anyone, maintaining his statement that he was not acting aggressively and trying to comply with orders. Coleman argues that Kelly was complicit in the use of force event by failing to do more than "stand idly by" while the other officers used excessive force.

Considering the foregoing in light most favorable to Coleman and the use of force event, a reasonably jury could find that Kelly's use of force against Coleman, combined with his failure to temper the situation as the other Defendants continued and started using force, evidences a malicious and sadistic intent to cause harm.

**Defendant Drake.**  Drake witnessed Oninku conduct the pat-down search of Coleman.  (Drake Dep., Doc. 25 at PageID# 522, 22:14–22:25).  Once Coleman was on the ground, Drake sprinted towards the scene.  (*Id*. at 24:22–25:1).  There were already three officers on top of Coleman.  (Doc. 2).  There is then conflicting testimony and evidence concerning when Drake removed his PR-24 from its holster and whether he used it by jabbing Coleman's side two times.  (*See* Doc. 2; Doc. 21-6; Coleman Dep., Doc 21-8 at PageID# 168, 106:16–106:22; Doc. 24-1 at PageID# 470; Drake Dep., Doc. 25 at PageID# 545, 45:8–11).  The Report states that "Officer Drake responded and used his PR-24 to gain control of Inmate Coleman's left arm."  (Doc. 24-1 at PageID# 470).  Drake disagreed with the report and testified he did not use his PR-24.  (Drake Dep., Doc. 25 at PageID# 551, 51:23–52:5).  The video does not clearly show whether the PR-24 was used.  (Doc. 2).

Considering the foregoing in light most favorable to Coleman and the use of force event, a reasonably jury could find that Drake's use of the PR-24 against Coleman when he was not aggressive and his hands were free to be cuffed, and Drake's failure to temper the situation and force already being used by Bailey, Oninku, and Kelly, demonstrates a malicious and sadistic intent to cause harm.

14

**Defendant Bennett.** The parties agree that Bennett arrived on the scene and pepper-sprayed Coleman's fact. Bennett contends he deployed a short burst of the spray to gain compliance from Coleman. (Doc. 21-7). However, according to Bailey, Coleman was already handcuffed by the time Bennett arrived. (Bailey Dep., Doc. 24, PageID# 421, 102:20–104:5). Coleman also maintained, as discussed with the other Defendants, that he was not resisting, not acting aggressively, and trying to comply with directives. Moreover, the video shows that, when Bennett arrived on the scene there were already about eight officers on top of Coleman. (Doc. 2). The inmates in the line all remained standing against the wall. (*Id*.)

Considering the foregoing in light most favorable to Coleman and the use of force event, a reasonably jury could find that Bennett's use of the OC spray when Coleman was already cuffed and restrained by multiple officers, and Bennet's failure to temper the situation and force already being used by Bailey, Oninku, Kelly, and Drake, demonstrates a malicious and sadistic intent to cause harm.

The Court recognizes that "prison officials 'must make their decisions in haste under pressure, and frequently without the luxury of a second chance.'" *Combs*, 315 F.3d at 557 (quoting *Hudson*, 503 U.S. at 6). "The issue is therefore not whether the use of force was absolutely necessary in hindsight, but whether the use of force could plausibly have been thought necessary." *Griffin v. Hardrick*, 604 F.3d 949, 954 (6th Cir. 2010) (quotation omitted).

But, as discussed, the facts surrounding the use of force incident are disputed, and, despite Defendants' contention that the audio-less video is dispositive, it is not.

15

Coleman's statement of the events is supported by record citations, including the Report and are not necessarily contradicted by the video. "Facts that are not blatantly contradicted by [a video] recording remain entitled to an interpretation most favorable to the non-moving party." *Coble v. City of White House*, 634 F.3d 865, 870 (6th Cir. 2011). Moreover, it is not this Court's place, when reviewing a summary judgment motion, to weigh the evidence and make credibility judgments. *Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010). "'[W]hen the non-moving party presents direct evidence refuting the moving party's motion for summary judgment, the court must accept that evidence as true." *Id.* (quoting *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir.1994)).

In sum, the video, the Report, and the testimony presented could support both Defendants' and Coleman's version of events. At this stage, the Court construes it in light most favorable to Coleman. A reasonable jury could conclude that Bailey, Oninku, Drake, Kelly, and/or Bennett lacked a good-faith basis for using the amount of force that Coleman alleges they used. A reasonable jury could conclude that when Drake, Bennett, and/or Kelly arrived at the scene, they failed to temper the severity of the situation and the amount of force used, and that they contributed to the use of excessive force. A reasonable jury could review and weigh the evidence and reach a result in Coleman's favor. Summary judgment on the subjective component is inappropriate.

16

### 2. Objective Component

This component requires the pain inflicted to be sufficiently serious and requires a contextual investigation as to whether the pain inflicted offends contemporary and evolving standards of decency. *See Cordell*, 759 F.3d at 580. Defendants argue that they are entitled summary judgment on the objective component because Coleman only sustained *de minimis* injuries and the Eighth Amendment excludes coverage for *de minimis* injuries. (Doc. 21 at 17 (citing *Hudson*, 503 U.S. at 9–10)). Defendants contend *de minimis* injuries cannot demonstrate "sufficiently serious" injuries for purposes of the objective prong of an Eighth Amendment claim. (*Id*.)

Defendants are mistaken. In an excessive force claim, the Supreme Court recognizes that the focus is on the extent and appropriateness of force used, not the extent of the plaintiff's injuries. *See Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) ("[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury"); *Hudson*, 503 U.S. at 7 ("The extent of Hudson's injuries thus provides no basis for dismissal of his § 1983 claim."). And, although the extent of injuries may provide helpful information related to the extent of force used, "[t]he seriousness of the injuries are not dispositive." *Williams*, 631 F.3d at 383.

Defendants also contend that Coleman fails to provide any evidence of his injuries or contradiction to a one-page medical report issued after the event, thus, the objective component fails. (Doc. 35 at 8 (citing Doc. 21-9)). However, Coleman testified during his deposition that he suffered bleeding from his face, knots on his head, blood clots in

his eyes, swollen wrists, scrapped forearms, bruises, two black eyes, back spasms, and PTSD after the event. (Coleman Dep. Doc. 21-8, PageID# 171, 119:12-126:8; PageID# 179, 152:9–1547). The video also depicts the approximately 40-seconds during which Coleman is taken to the ground, overtaken by 8-10 officers, and beaten. (Doc. 2). Coleman is then seen struggling to walk and limping away once handcuffed after the event. (*Id*.) A reasonably jury may view such evidence and find that the pain inflicted and conduct of the officers offends contemporary standards of decency.

Accordingly, summary judgment on the objective component is not warranted.

### C. Count II - Failure to Protect

Coleman's second cause of action is a failure to prevent the excessive use of force against Kelly, Bailey, Drake, and Bennett. (Doc. 1 at 8). Defendants do not discuss this claim in their opening motion, seemingly suggesting that this claim fails because there is no excessive force. (*See* Doc. 21). However, Defendants ask for a full dismissal of Coleman's complaint, and the parties discuss protection and intervention in their responsive memoranda; thus, the Court will consider this claim.

"A correctional officer who observes an unlawful beating may, nevertheless, be held liable under § 1983 without actively participating in the unlawful beating." *McHenry v. Chadwick*, 896 F.2d 184, 188 (6th Cir. 1990) (citing *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982)). However, here, Coleman's failure to protect claim fails because, as discussed, each Defendant participated in the beating at some level. Moreover, each officer's failure to temper the use of force goes directly to whether the officers possessed the culpable state of mind for Coleman's excessive force claim.

18

Accordingly, Defendants' motion for summary judgment on the failure to protect claim is **GRANTED**.

### D.     Qualified Immunity

Defendants last argue that they are entitled to qualified immunity because Coleman cannot demonstrate the objective or subjective components of the Eighth Amendment analysis.  (Doc. 21 at 21).

 "At summary judgment, a government official is entitled to qualified immunity unless the plaintiff can establish both that (1) there is a genuine dispute of material fact as to whether the official deprived her of a constitutional right, and (2) the right was clearly established at the time of the official's actions such that a reasonable official would have known that her actions were unconstitutional."  *Hicks v. Scott*, 958 F.3d 421, 430 (6th Cir. 2020) (citing *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009)).  "A reviewing court has 'discretion to decide the order in which to engage these two prongs.'"  *Id*. (citing *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)).

The first prong is met because, as discussed, there is a genuine dispute of material fact as to whether each defendant deprived Coleman of his constitutional right, using excessive force in violation of the Eighth Amendment.

Second, for a right to be clearly established, "the right's contours [need to be] sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  *Cordell*, 759 F.3d at 587 ("any reasonable official would know that ramming a handcuffed and controlled prisoner headfirst into a concrete wall is an unreasonable method of regaining control of a prisoner in a hallway occupied

only by other jail officials").  "The relevant question here is whether it would be clear to a reasonable officer that [their] conduct was unlawful in the situation he confronted." *Schreiber*, 596 F.3d at 333 ("right to be free from excessive force clearly established" when officer repeatedly punched inmate in face while in handcuffs).

Reviewing the facts in light most favorable to Coleman, reasonable officers would know that the actions taken by Defendants were unreasonable in these circumstances.  It would be unreasonable to use 20 punches to the head, neck, and shoulder area to restrain an inmate when the inmate's hands were visible to cuff (Bailey).  It would be unreasonable to slam an inmate's face into the ground twice to regain control of an inmate (Oninku).  It would be unreasonable to kneel on an inmate's leg, witness the force used by other officers, and aid in the force used (Kelly).  It would be unreasonable to ram an inmate's side with a PR-24 twice to regain control when the inmate is not resisting, and the inmate's hands are available to cuff (Drake).  It would be unreasonable to pepper spray an inmate's face after he is already restrained in handcuffs (Bennett).  And, it would be unreasonable for the amount of force used to continue when the inmate is not acting aggressively, when the inmate is surrounded by 8-10 other officers, and in response to a dress code-violation.

Defendants' request for qualified immunity is **DENIED**.

20

## IV. CONCLUSION

Based upon the foregoing, Defendants' motion for summary judgment (Doc. 21) is

**GRANTED IN PART** and **DENIED IN PART**. Plaintiff's second cause of action for

failure to protect is **DISMISSED**. Plaintiff's first cause of action for excessive force

remains pending.

**IT IS SO ORDERED.**

Date:  ___8/17/2021_____                    ___*s/Timothy S. Black*_____
                                                Timothy S. Black
                                                United States District Judge